UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
08-CV-6427(JMR/JJK)

Victoria Johnson )
 )
 v. ) ORDER
 )
James Steven Carroll, et al. )

This case concerns an individual's legal rights and obligations when witnessing an arrest. The parties agree the events at issue occurred December 20, 2006. Beyond that, their versions of the facts differ greatly. Plaintiff claims she suffered actionable battery, negligence, and was subjected to excessive force.

The defendants seek summary judgment. The motion is considered pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). As such, the Court takes all factual allegations in the light most favorable to plaintiff, the non-moving party. The facts are from the parties' pleadings, and are not determinations on the merits. Defendants' motion is granted.

I. <u>Plaintiff's Version of the Facts</u>

In the early evening of December 20, 2006, 20-year-old Joseph McClennon stood outside his aunt's house in Minneapolis, Minnesota, where he lived. He was waiting for his girlfriend. (McClennon Dep. 5:1-11.)

Plaintiff was inside her home at the time, preparing to attend bible study, when her son told her "the police [were] outside harassing Joseph." (Johnson Dep. 58:25-59:1.) She immediately ran outside and observed a police officer (the "arresting officer") telling her nephew to empty his pockets. He did so, placing the items on the hood of the squad car. He was then detained in the backseat of the squad.

Two more officers arrived at the scene.[1] When she asked them what was going on, she claims the Caucasian officer said, "You are ignorant," and the Asian officer said she was acting "childish." (Johnson Dep. 69:10-70:5.)

During this exchange, plaintiff's nephew remained in the squad car. Plaintiff states she was standing about two or three feet from the car when she heard a radio dispatcher say, "[Y]ou can't charge him for that." (Johnson Dep. 75:5-19.) She apparently assumed the dispatcher was referring to her nephew, because at that point, the arresting officer released him from the car and threw a ticket at him.

Plaintiff then claims, as her nephew was walking to the front of the car to collect his belongings, the arresting officer swung something at him, and then grabbed him, "pulled him out into the street," and pushed him backward. (Johnson Dep. 76:22 - 80:10.)

---

[1] Plaintiff identifies these officers as the "Caucasian officer" and the "Asian officer," later identified as Alan Kipke and Chad Hofius, respectively.

At this point, plaintiff "moved toward [McClennon]" holding him in a bear hug to protect him from the officer's blows. As she held her nephew, she realized the officer was preparing to taser him.

An officer from the second squad car then grabbed plaintiff's arms, pulled her off her nephew, and "threw [her] to the ground." Undeterred, she "rushed back over to [McClennon] and grabbed him again." (Johnson Dep. 84: 22-23.) Once more, an officer grabbed her from behind and threw her to the ground. (Johnson Dep. 85:20-23.)

The arresting officer tasered McClennon, who fell to the ground. For the third time, plaintiff "crawled over to [McClennon]" and "covered his body" with hers. She then looked up at the arresting officer who sprayed her with mace. (Johnson Dep. 86:13-18.) Unable to see, she backed up, crawled to the curb, and leaned against a tree. Her left knee felt dislocated. She was placed under arrest.

## II. The Officers' Version of the Facts

As Officers James Carroll and Paul Schweiger were driving westbound on 30th Avenue North, they observed a black male standing by a parked vehicle. (Carroll Dep. 11:13-18; Schweiger Dep. 13:7-25.) Officer Schweiger "thought he may be breaking in the vehicle," and rolled his window down to ask the man what he was doing. Joseph McClennon answered that it didn't matter what he was doing. Suspicions aroused, the Officers parked their squad

3

car.  Officer Schweiger then escorted McClennon to the car, and, while doing a pat-down search, found a pipe coated with a "black burned residue" he thought smelled of marijuana.

The Officers detained McClennon in the backseat of the squad car, identified him, and issued a citation for possession of drug paraphernalia.  After Schweiger wrote the ticket, two other officers, Kipke and Hofius, pulled up.  Schweiger then released McClennon.  As McClennon walked away, he realized his belongings were on the hood of Schweiger's car, and returned to collect them.

According to Schweiger, "that is when [McClennon] took a swing at [him]." (Schweiger Dep. 28:13.)  Schweiger claims the punch never landed, because he "grabbed [McClennon]" and "ran him into the side of the squad."  Hofius came to Schweiger's assistance.  They wrestled McClennon "face down on the pavement" and tried to handcuff him.  Kipke tasered McClennon in an attempt to bring him under control.  (Hofius Dep. 14:8-10.)

During the altercation, about eight people gathered around the Officers yelling at them to leave.  Schweiger reports plaintiff ran past him and jumped on McClennon's back, "like she was trying to blanket McClennon."  Hofius "[told] her to get off him."  When she refused, Hofius sprayed her with mace, and Schweiger "grabbed [plaintiff] and pulled her up." (Schweiger Dep. 43:10.)

With plaintiff out of the way, Hofius was able to handcuff McClennon and put him into Schweiger's squad car.  Hofius

approached plaintiff and arrested her for obstructing legal process. (Hofius Dep. 16:21-22.)

For purposes of this motion only, the Court credits plaintiff's version of the facts.

A. <u>Post-Arrest</u>

Officers Schweiger and Carroll took plaintiff to the Minneapolis jail. Seeing her knee was hurt, she was treated by a nurse and given a wheelchair. She was initially charged with obstructing legal process and held for 72 hours. The City of Minneapolis (the "City") declined to prosecute.

After plaintiff's release from jail, a doctor treated her for knee pain, and prescribed painkillers, anti-inflammatory medication, and physical therapy. Plaintiff eventually needed ACL surgery to repair her knee. She continues to experience difficulties from the injury which affect her ability to walk, run, and climb stairs. (Pl.'s Mem. Opp. Summ. J. 21.)

In March 2008, plaintiff asked the City for copies of the police records concerning her arrest. On April 2, 2008, the City Attorney's Office gave her the public police report of her December 20, 2006, arrest. On November 14, 2008, plaintiff submitted a second document request seeking all "public and private data concerning her" arrest. (Compl. ¶ 29.) In February 2009, the City "fulfilled her request," and provided her with twelve additional pages of materials. (Pl.'s Mem. Opp. Summ. J. 55.)

B. <u>This Lawsuit</u>

On December 19, 2008, plaintiff sued the City of Minneapolis, and Officers A, B, and C.[2] Plaintiff served the City with the summons and complaint that same day. She delivered the summons and complaint for each of the four individual defendants to the Hennepin County Sheriff on February 23, 2009. The sheriff served Schweiger, Carroll, and Kipke two days later, and served Hofius on March 25, 2009. Plaintiff amended her complaint on December 22, 2008, and June 30, 2009.

Plaintiff's second amended complaint alleges the Officers used excessive force, in violation of 42 U.S.C. § 1983. She invokes the doctrine of respondeat superior to accuse the Officers and the City of common law battery and negligence. Finally, she claims the City failed to adequately respond to her public data request, in violation of the Minnesota Government Data Practices Act, Minn. Stat. §§ 13.03 & 13.04.

Defendants seek summary judgment arguing they are entitled to qualified and official immunity; that the statute of limitations has run on plaintiff's battery claim; and that plaintiff failed to demonstrate any damages as required by the Data Practices Act.

---

[2] Plaintiff's opposition to defendants' motion for summary judgment names Officers Carroll, Hofius, Kipke, and Schweiger, and does not reference unnamed officers A, B, and C. Accordingly, the Court dismisses officers A, B, and C, where the true identity of the defendants has been determined. <u>See</u> <u>Porter v. Doe</u>, 938 F.2d 189, 189 (8th Cir. 1991).

6

Plaintiff opposes defendants' motion.

III. <u>Analysis</u>

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. <u>See</u> <u>Anderson</u>, 477 U.S. at 250.

A. <u>Section 1983: Qualified Immunity</u>

Defendants claim they are entitled to qualified immunity. Qualified immunity shields officers from suit for official acts when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). A court analyzes claims of qualified immunity applying a two-pronged test: the court asks whether defendant violated a constitutional right, and whether that right was clearly established when the violation occurred. <u>Id.</u> District courts may "exercise their sound discretion in deciding which of the two prongs" to address first. <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 818 (2009).

Defendants acknowledge plaintiff's "right to be free from excessive force is a clearly established right under the Fourth

7

Amendment's prohibition against unreasonable seizures of the person." Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998). Defendants deny the Officers used unreasonable force and violated plaintiff's constitutional rights. The Court agrees.

When considering the reasonableness of the Officers' seizure, the Court asks whether their actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). Here, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (internal quotations omitted). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion." Id.

Plaintiff admits that when the Officers tried to handcuff her nephew, she "grabbed" him in a bear hug and "covered him with [her] body." (Johnson Dep. 82:1-4; 83:2-3.) She claims the Officers then grabbed her shoulderblades and arms, pulled her backward, and "threw" her to the ground. (Johnson Dep. 84:1.) Plaintiff acknowledges she "rushed back over to [McClennon] and grabbed him again." An officer "grabbed [her] again . . . and threw [her] to the ground." (Johnson Dep. 85:20-23.) Undeterred, plaintiff crawled to McClennon and again covered his body with hers. It was

at this time she remembers the arresting officer spraying mace in her eyes.[3]  (Johnson Dep. 86:13-18.)  On these facts, the Court finds plaintiff's repeated interference with the arrest endangered the Officers and herself.  Reasonable officers would have believed her actions could have escalated their encounter with the crowd and McClennon.

That plaintiff suffered a knee injury does not affect the Court's calculus.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment."  Graham, 490 U.S. at 396 (internal citations omitted).  The Officers appropriately decided to remove plaintiff from the altercation and ultimately sprayed her with mace so they could perform their duties and control the situation.  Her injuries stem from her repeated attempts to interfere with the arrest.  Where plaintiff voluntarily interfered with the arrest, despite repeated efforts to prevent her from doing so, the Court finds the Officers' actions were objectively reasonable as a matter of law.

Plaintiff, however, suggests she was authorized to act as she did because she believed the Officers lacked probable cause to make the arrest.  She emphasizes hearing the squad car radio dispatcher say, "You can't charge him for that."  Based on this, she concluded the Officers "had no basis" to arrest McClennon.  (Pl.'s Mem. Opp.

---

[3] Schweiger acknowledges pulling plaintiff off McClennon, and Hofius admits he maced plaintiff.

Summ. J. 44.) Seizing upon this slender reed, plaintiff concludes the Officers are unjustified in claiming qualified immunity. The Court disagrees.

As an initial matter, plaintiff - a citizen volunteer - lacks standing to challenge the legality of an arrest. To establish standing, plaintiff must show she "suffered an injury in fact, meaning that the injury is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal citations omitted); see also Davis v. Fulton County, Ark., 884 F. Supp. 1245, 1250 (E.D. Ark. 1995) (section 1983 does not afford a husband a cause of action based on constitutional deprivations suffered by his wife). Here, plaintiff's case cannot be premised on an injury sustained by her adult nephew.

Plaintiff extends her argument, however, proffering a case positing that "danger invites rescue." See Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998); Benike v. Dairlyland Ins. Co., 520 N.W.2d 465, 467-68 (Minn. Ct. App. 1994). Minnesota law affords plaintiff no succor. The Eighth Circuit Court of Appeals in Hill v. Scott, 349 F.3d 1068, 1074 (8th Cir. 2003), found "[t]here is no right to resist an unlawful search or arrest." And, while an individual has a right to resist an officer's excessive force, a third-party intervenor does not partake of that right. Cf. Hill, 349 F.3d at 1074; see also Darrah v. City of Oak Park, 255 F.3d

10

301, 313 (6th Cir. 2001)(third party has no right to intervene physically on arrestee's behalf "even if she thought the officer's use of force was excessive").

Plaintiff makes much of Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998). There, when a father refused to let officers enter his home to arrest his son, the officers grabbed his wrist, pushed him backwards, and held his arm against the wall. Id. Because he "was recovering from surgery on his left shoulder and was wearing a sling on his left arm when he answered the door," the Court concluded a genuine issue of fact remained as to "whether such force was excessive under the circumstances." Id.

Contrary to plaintiff's assertions, Guite v. Wright does not establish a third-party right to intervene in an arrest - it merely reiterates established law preventing an officer's use of unreasonable force.

Plaintiff's reliance on the "danger invites rescue" doctrine is similarly unavailing. The doctrine holds an "original wrongdoer, whose negligent conduct threatened harm to another," is liable "to the rescuer who was injured as a result of an attempt to avoid the threatened harm." Benike, 520 N.W.2d at 467 (Amundson, J., concurring). "More succinctly, 'danger invites rescue' and the wrong that imperils the victim is a wrong to the rescuer." Id. This seldom-invoked common law doctrine applies in negligence cases, and "is legal shorthand for a particular factual situation

11

in which courts find the [negligence] foreseeability requirement is satisfied." Krause v. U.S. Truck Co., 787 S.W.2d 708, 710 (Mo. 1990). The present case involves an individual interfering with the state's lawful exercise of its police power; the asserted doctrine is simply inapplicable to plaintiff's claims.

Finally, but importantly, the Court considers plaintiff's claim of hearing "You can't charge him for that" uttered over the squad car radio to be utterly insubstantial, and wholly insufficient to support her claim. (Johnson Dep. 75:5-19.) At oral argument, plaintiff's counsel admitted there was absolutely nothing in the radio transmission tying it to McClennon's arrest. The plaintiff does not know whether those words were in response to a radio call from the Officers on the scene, nor can she, even as late as summary judgment, identify the declarant. Further, her attorney did not obtain or provide the Court with a copy of the claimed police radio transmission.

But even if the words were uttered, and even if they related to McClennon's arrest, they still do not support plaintiff's claims or deprive the Officers of qualified immunity. Assuming the words were a direction to the Officers on the scene telling them not to arrest McClennon - a prospect the Court considers highly unlikely - they exemplify the problem of confusing motive with intent. Plaintiff's motive was to protect her nephew from an unlawful arrest, but her intent was to interfere with the Officers in their

work. The law does not confer upon a bystander the authority or right to interfere with officers in the performance of their duties. While her motive may have been pure, plaintiff remains unauthorized to lawfully perform the act she intended to commit.

Finding no violation of a constitutional right, the Court need not ask whether that right was clearly established. See Coleman v. Parkman, 349 F.3d 534, 538 (8th Cir. 2003).

B. Statute of Limitations

Defendants ask the Court to dismiss plaintiff's battery claim for failure to comply with Minnesota's two-year statute of limitations.[4] Specifically, they argue plaintiff failed to serve the individual Officers until February and March of 2009. The battery of which plaintiff complains occurred on December 20, 2006, meaning the two-year limitations period expired on December 19, 2008. Defendants maintain the Court should dismiss that claim as untimely. The Court agrees.

Under Minn. Stat. § 541.07, a party must "commence" a battery action "within two years." Fed. R. Civ. P. 3 provides that "a

---

[4] Defendants' Reply Brief states they "have not argued in the instant summary judgment motion that a two-year statute of limitations entitles defendants to summary judgment on plaintiff's § 1983 claim." (Defs.' Reply 9.) This statement seems inconsistent with their brief which makes the very argument they deny asserting. (Defs.' Mem. Supp. Summ. J. 18). The Court addresses this issue only to note that the law is clear – the Supreme Court has held that courts should follow general or residual state statutes for personal injury actions when considering § 1983 claims. Owens v. Okure, 488 U.S. 235, 250 (1989).

13

civil action is commenced by filing a complaint with the court." This contrasts with Minn. R. Civ. P. 3, under which a civil action does not commence until a "summons is served upon that defendant," or when a summons is delivered to a defendant's county sheriff. In light of this dichotomy, the issue of whether plaintiff provided timely service of process turns upon whether state or federal law applies.

The law is clear - "state rules for the service of process apply to pendent state law claims." McKenzie v. Lunds, Inc., 63 F. Supp. 2d 986, 1001 (D. Minn. 1999)(citing Anderson v. Unisys Corp., 47 F.3d 302, 309 (8th Cir. 1995)). Plaintiff acknowledges delivering her summons to the Hennepin County Sheriff on February 23, 2009. The Sheriff served Schweiger, Carroll, and Kipke two days later, and Hofius on March 25, 2009. Here, the two-year period expired on December 19, 2008. When plaintiff delivered her summons to the Sheriff, the delivery was tardy, and her action was barred by the two-year statute of limitations. Accordingly, the Court dismisses plaintiff's battery claim against the individual defendants.

   C. <u>State Law Claims: Official Immunity</u>

Even if service of the summons and complaint was timely, the individual defendants are entitled to official immunity for plaintiff's state law negligence and battery claims, and the City is not liable.

In the absence of malice, Minnesota law holds public officials immune from state law claims where their duties require an exercise of discretion. Johnson v. Morris, 453 N.W.2d 31, 41-42 (Minn. 1990); see also Susla v. State, 247 N.W.2d 907, 912 (Minn. 1976)("[A] public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."). Malice is defined as "intentionally committing an act that the official has reason to believe is legally prohibited." Kelly v. City of Minneapolis, 598 N.W.2d 657, 663 (Minn. 1999). A court considering this question conducts "an objective inquiry into the legal reasonableness of an official's actions." State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571 (Minn. 1994).

Viewing the facts in the light most favorable to plaintiff, the Court finds she has failed to produce evidence showing defendants "intentionally committ[ed] an act that [they had] reason to believe [was] legally prohibited." Kelly, 598 N.W.2d at 663. Indeed, as already discussed, the Court has concluded these Officers acted reasonably under the circumstances.

As the Court has found the individual defendants entitled to immunity, the City is similarly entitled to vicarious official immunity from plaintiff's respondeat superior claims. See Wiederholt v. City of Minneapolis, 581 N.W.2d 312, 316 (Minn.

1998)("[V]icarious official immunity protects the government entity from suit based on the official immunity of its employee.").

   D. <u>Minnesota Government Data Practices Act</u>

Finally, defendants argue plaintiff has failed to state a claim under the Minnesota Government Data Practices Act. Plaintiff claims the City failed to timely respond to her November 2008 data request, in violation of Minn. Stats. §§ 13.03 & 13.04. (Compl. ¶ 29.) Plaintiff, however, has failed to allege the appropriate elements to prove her claim.

As an initial matter, plaintiff has wholly failed to assert any damages resulting from the alleged government delay. A government entity which violates the Data Practices Act may be liable to any person "who suffers any damage as a result of the violation." Minn. Stat. § 13.08. A damaged individual may seek recompense for "any damages sustained, plus costs and reasonable attorney fees." <u>Id.</u> Here, none have been asserted. For this reason alone, the Court could conclude plaintiff has failed to state a claim under the Act.

Plaintiff, however, maintains she sought information concerning her arrest in March and November 2008. It is undisputed that the City responded to her March request by providing her attorney with two pages of material on April 2, 2008, which included the December 20, 2006, police report, and the Officers' names. On November 14, 2008, plaintiff submitted a second request

to the City seeking all "public and private data concerning her" arrest. (Compl. ¶ 29.) In February 2009, the City "fulfilled her request" and provided plaintiff with twelve additional pages of material. (Pl.'s Mem. Opp. Summ. J. 55.)

While plaintiff argues the City did not provide this data within a reasonable time, neither plaintiff's complaint nor her brief describe how the City's delay damaged or impeded her suit in any way. Where damages constitute an element of the claim, and no damages are asserted, plaintiff fails to state a Data Practices Act claim upon which relief can be granted.

IV. Conclusion

Plaintiff confirms she repeatedly attempted to interrupt the Officers as they dealt with Joseph McClennon. Under these circumstances, the Officers' use of force appears eminently reasonable.

Accordingly, IT IS ORDERED that:

1. Defendants' motion for summary judgment is granted [Docket No. 47]; and

2. The Court dismisses all claims against defendants.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 28, 2010

s/ James M. Rosenbaum
JAMES M. ROSENBAUM
United States District Judge